IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Express Diagnostics Int'l, Inc., | NO. C 06-01346 JW |
| Plaintiff, | **ORDER GRANTING IN PART DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTION FOR CONTEMPT** |
| v. | |
| Barry M. Tydings, et al., | |
| Defendants. | |

## I. INTRODUCTION

Express Diagnostics International, Inc. ("EDI" or "Plaintiff") brings this action against Defendants[1] alleging, *inter alia*, trademark infringement and unfair competition. Plaintiff alleges that its product, DrugCheck, is the subject of a valid and enforceable trademark and that Defendants have infringed Plaintiff's rights in the DrugCheck mark through their manufacture and sale of infringing products.

---

[1] Defendants are Barry M. Tydings ("Tydings"), Merina Kisera ("Kisera"), Premium Diagnostics International, Inc. ("PDI"), Jianfeng "Jeff" Chen ("Chen"), Amedica Biotech, Inc. ("Amedica"), Zyon International, Inc. ("Zyon"), Patrick Beentjes ("Beentjes") and Twin Spirit, Inc. ("Twin Spirt").

Presently before the Court are Defendants' Motions for Summary Judgment[2] and Defendants' Motion re: Plaintiff's Contempt and Objections to Magistrate's Discovery Order.[3] The Court found it appropriate to take the matter under submission without oral argument. See Civ. L.R. 7-1(b). Based on the papers submitted to date, the Court GRANTS in part and DENIES Defendants' Motions for Summary Judgment and DENIES Defendants' Motion for Contempt.

## II. BACKGROUND

A detailed outline of the allegations and the parties involved in this action may be found in the Court's March 30, 2007 Order. (Docket Item No. 98.) The Court reviews the undisputed facts and procedural history that are relevant to the present Motions.

### A. Undisputed Facts

EDI is an Iowa corporation, with its principal place of business in Minnesota. In 2004, EDI entered into an exclusive license agreement ("License") with Drug Free Workplace Administrators, Inc. ("DFWA"), the holder of the trademark rights in a "Drugs of Abuse Testing Product," known as "DrugCheck."[4] (Declaration of James Hipple in Opposition to Amedica's Partial Motions for Summary Judgment, Ex. 6, hereafter, "Hipple Decl.," Docket Item No. 240.) Pursuant to the terms of the License, DFWA granted EDI the exclusive worldwide right to use the DrugCheck mark in connection with products purchased from third-party manufacturer Amedica.[5] (Id.) In January

---

[2] (Motion for Partial Summary Judgment on Plaintiff's Trademark Counts, hereafter, "Trademark Motion I," Docket Item No. 197; Motion for Partial Summary Judgment on Plaintiff's Business Torts Counts 11-14, hereafter, "Tort Motion," Docket Item No. 212; Motion for Partial Summary Judgment on Plaintiff's Infringement Claims, hereafter, "Trademark Motion II," Docket Item No. 253.) These motions are only brought by Defendants Amedica and Chen.

[3] (hereafter, "Contempt Motion," Docket Item No. 217.)

[4] DFWA owned U.S. Trademark No. 2,258,205 for the name "DRUGCHECK." This trademark is registered on the Supplemental Trademark Registry.

[5] The Licence also allowed EDI to purchase products for sale as "DrugCheck" from other manufacturers, as well, so long as EDI purchased products based on the technology patented in U.S. Patent No. 6,497,843 ("'843 patent"). This patent is owned by Zyon International, Inc. ("Zyon"). The '843 patent includes urinalysis drug testing cups containing an assay of drug-recognition reagents.

1 2008, EDI acquired an assignment in all rights and title to the DrugCheck mark, and now holds the
2 registration with the U.S. Patent and Trademark Office ("PTO"). (Declaration of Paul Johnson in
3 Opposition to Amedica's Partial Motions for Summary Judgment, Ex. 25, hereafter, "Johnson
4 Decl.," Docket Item No. 241.)

5 Amedica manufactured products for EDI based on the '843 patent, which covers the
6 technology used in the DrugCheck product, under a non-exclusive license from Zyon
7 ("Amedica/Zyon Agreement"). (Hipple Decl., Ex. 6.) The Zyon/Amedica Agreement expressly
8 provided that Amedica's use of the '843 patent was exclusively to manufacture DrugCheck cups for
9 EDI. (Id.; Declaration of Jeff Chen in Support of Motion for Partial Summary Judgment, Ex. A,
10 hereafter, "Chen Decl.," Docket Item No. 214.) The Zyon/Amedica Agreement, which was entered
11 into in 2004, was terminated by Zyon in January 2006. In a third related agreement, EDI entered
12 into a manufacturing contract with Amedica ("OEM Agreement"), by which Amedica agreed to
13 manufacture DrugCheck cups exclusively for EDI. (Chen Decl., Ex. B, Docket Item No. 215.)

14 **B.     Procedural History**

15 On February 23, 2006, Plaintiff filed a Complaint alleging that Defendant Beentjes, a former
16 EDI employee, conspired with Defendants Zyon, Tydings, Kisera and Hipple to manufacture,
17 market and distribute a product identical to DrugCheck called Drug Smart. (Complaint ¶¶ 46-47,
18 Docket Item No. 1.)

19 Plaintiff alleges twenty-one causes of action, as follows:

| | **Cause of Action** | **Defendant** |
|---|---|---|
| 1 | Trademark Infringement | All |
| 2 | Trademark Dilution | All |
| 3 | Contributory Infringement | All |
| 4 | Unfair Competition (15 U.S.C. § 1125) | All |
| 5 | Common Law Trademark Infringement | All |
| 6 | Unfair Competition and Unfair Business Practices (Cal. Bus. & Prof Code § 17200) | All |

United States District Court
For the Northern District of California

| 7 | Breach of Contract | Tydings |
|---|---|---|
| 8 | Breach of Contract - Third Party Beneficiary | Zyon, Tydings, Kisera, Amedica, Chen |
| 9 | Breach of Contract | Amedica, Chen |
| 10 | Trade Secret Misappropriation | Beentjes, Twin Spirit |
| 11 | Intentional Interference with Contractual Relations | All |
| 12 | Negligent Interference with Contractual Relations | All |
| 13 | Intentional Interference with Prospective Economic Advantage | All |
| 14 | Negligent Interference with Prospective Economic Advantage | All |
| 15 | Fraud and Deceit | Tydings, Kisera, Zyon, PDI, Chen, Amedica, Beentjes |
| 16 | Negligent Misrepresentation | Tydings, Kisera, Zyon, Chen, Amedica, Beentjes |
| 17 | Trade Libel | All |
| 18 | Civil Conspiracy | All |
| 19 | Antitrust - Violation of Sherman Act Section 1 | All |
| 20 | Antitrust Violation of Cartwright Act § 16720 | All |
| 21 | Conversion | Beentjes |

(See Complaint.) In late 2006, a number of original Defendants, James Hipple, DFWA, Spears Medical, Inc., and Steven Alan Spears, were dismissed from this action. On March 30, 2007, the Court denied various motions by the remaining Defendants to either transfer or dismiss this case. (See Docket Item No. 97.)

Presently before the Court are Defendants' Motions for Partial Summary Judgment and Defendants' Motion for Contempt.

### III. STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

4

56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion . . . ." Id. at 323. "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The non-moving party "may not reply merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

When evaluating a motion for summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). The court draws all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight that particular evidence is accorded. See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992). The court determines whether the non-moving party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987). In such a case, summary judgment is inappropriate. Anderson, 477 U.S. at 248. However, where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

**A.    Trademark Claims**

Defendants move for summary judgment on Plaintiff's trademark claims on the grounds that (1) the alleged DrugCheck mark is invalid and unenforceable and (2) Plaintiff has acquiesced to Defendants' use of the DrugCheck mark. (Trademark Motion I at 1; Trademark Motion II at 1.) The Court considers each contention in turn.

5

**1. Validity of the DrugCheck Mark**

Defendants contend that the DrugCheck mark is unprotectable as a trademark because it is either (1) generic or (2) descriptive, and devoid of any secondary meaning. (Trademark Motion I at 1.) Plaintiff contends that DrugCheck is descriptive, and that there is evidence of secondary meaning sufficient to bring DrugCheck within the protection of the trademark laws. (Plaintiff EDI's Opposition to Amedica's Partial Motions for Summary Judgment on Trademark Claims at 19, hereafter, "Trademark Opposition I," Docket Item No. 247.)

There are four recognized categories of terms that can be the subject of trademark protection: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. Surgicenters of America, Inc. v. Medical Dental Surgeries Co., 601 F.2d 1011, 1014 (9th Cir. 1979); Filipino Yellow Pages, Inc. v. Asian Journal Publications, 198 F.3d 1143, 1146 (9th Cir. 1999).

**a. Genericness of the "DrugCheck" Mark**

At issue is whether "DrugCheck" is a generic term.

Generic terms are those that refer "to the genus of which the particular product or service is a species." Surgicenters, 601 F.2d at 1014. Generic terms can never be the subject of trademark protection. Id. To determine whether a term is generic, a court must ask whether "the primary significance of the trademark is to describe the type of product rather than the producer." Filipno Yellow Pages, 198 F.3d at 1147. According to the Ninth Circuit, if the term answers the buyer's questions "Who are you? Where do you come from? Who vouches for you?," the term is protectable as a trademark. Id. (quoting Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1391 (9th Cir. 1993)). In contrast, a generic term product name merely answers the question, "What are you?" Id. When a trademark is properly registered it is presumptively valid, and the burden of proving genericness is on the defendant. Id. at 1146 (citing 15 U.S.C. § 1057(b)). Where, however, a mark is not federally registered, the plaintiff bears the burden of proving non-genericness once the defendant asserts genericness as a defense to infringement. Id.

In this case, it is undisputed that DrugCheck was registered on the Supplemental Register in 1998. (Hipple Decl., Ex. 5.) Although James Hipple had originally applied for registration on the Principal Register, the PTO rejected the application on the ground that DrugCheck was descriptive. (Id., Ex. 2.) In the relevant Office Action, the examining attorney stated:

> In this case the applicant's mark "DRUGCHECK" is descriptive of the purpose of the goods. The goods are a "test cup for the detection of drugs in urine." The proposed mark is descriptive based on the ordinary meanings of the terms combined to create the proposed mark. One of the ordinary meanings of the term "CHECK" is "a standard for inspecting or evaluating; a test." A mark which combines descriptive terms my be registrable if the composite creates a unitary mark with a separate nondescriptive meaning. However, in this case the combination of the terms does not alter their descriptive significance. The proposed mark clearly indicates to relevant consumers that the purpose of the goods is to test or "check for drugs."

(Id. (internal citations omitted).) In the wake of this PTO rejection, Hipple successfully applied to have DrugCheck registered on the Supplemental Register.[6]

Given that registration on the Supplemental Register is only available to marks that are "capable of distinguishing" and that generic marks are never capable of distinguishing, the PTO has determined that the DrugCheck mark is descriptive and is not generic. See 15 U.S.C. § 1091. In the initial rejection, the examining attorney clearly stated his conclusion that DrugCheck was "descriptive of the purpose of the goods," which themselves were described as a "test cup for the detection of drugs in urine."[7] (Hipple Decl., Ex. 2.)

Since the PTO has determined that DrugCheck is a descriptive mark, and has subsequently placed it on the Supplemental Register, the burden shifts to Defendants to demonstrate that DrugCheck is generic. Filipino Yellow Pages, 198 F.3d at 1146. Defendants contend that DrugCheck is generic because it is the composite of two generic terms, "drug" and "check." (Trademark Motion I at 6-7.) Defendants also contend that the term "drug check" is commonly used

---

[6] The Court notes that the parties have interchanged the mark, "DrugCheck" with lower and upper case letters. However, neither party has argued that it has any significance meaning to the mark.

[7] In the Registration, the description of the product was changed to a "test cup containing reagents for the use in the detection of drugs in urine." (Hipple Decl., Ex. 5.)

7

1 by the news media and by other manufacturers to refer to the act of testing or checking for drugs. (Id.
2 at 9-12.)

3 The Court finds Defendants' contentions unpersuasive. First, the Ninth Circuit has expressly
4 permitted trademark protections for composite terms. See Filipino Yellow Pages, 198 F.3d at 1148.[8]
5 In this case, even though the individual terms, "drug" and "check" are generic, together they are
6 descriptive of the product. That is, the composite term does not expressly answer the "What are
7 you?" question, which is what it must do for a finding of genericness. See id. at 1147. DrugCheck is
8 a specific type of product that checks for drugs: "a test cup containing reagents for the use in the
9 detection of drugs in urine." (See Hipple Decl., Ex. 5.) Accordingly, asking "What are you?" does
10 not provide anything more than a vague description of the DrugCheck product.

11 Second, the Court is not persuaded that the use of the phrase "drug check" in the news media
12 or as a descriptor for other drug testing products operates as a conclusive rebuttal of the
13 presumptively descriptive nature of the DrugCheck mark. Defendants must demonstrate that
14 DrugCheck is generic with respect to the type of product at issue in this case. Even though the phrase
15 "drug check" is generally associated with checking for drugs, Defendants' evidence suggests nothing
16 more than this obvious fact.[9] In other words, Defendants have not shown that the mark "DrugCheck"
17 is a generic descriptor for the particular means of checking for drugs embodied by Plaintiff's product.

18 Accordingly, the Court finds that the DrugCheck mark is not generic. Thus, the issue
19 becomes whether the descriptive DrugCheck mark has acquired sufficient secondary meaning to
20 qualify for trademark protection.

---

[8] Indeed, the PTO dealt with the composite nature of the DrugCheck term when it issued its initial rejection of Hipple's registration application.

[9] The Court notes that the generic term most associated with Plaintiff's product is probably "drug test," rather than "drug check." Plaintiff has provided evidence that, in Plaintiff's industry, "drug test" is the nominal genus of which DrugCheck is a species. (See Tydings Decl. ¶ 5.)

8

### b. Secondary Meaning Associated With "DrugCheck"

As the moving party, Defendants bear the burden of showing that there are no material issues of disputed fact with respect to secondary meaning associated with DrugCheck.

Unlike generic terms, descriptive terms can be the subject of trademark protection under certain circumstances. Filipno Yellow Page, 198 F.3d at 1147. Although descriptive terms do not enjoy presumptive trademark protection, they may become protected if they have acquired "secondary meaning in the minds of consumers [by becoming] distinctive of the trademark applicant's goods in commerce." Id. (quoting 15 U.S.C. § 1052(f)).

Secondary meaning can be demonstrated in numerous ways including, *inter alia*, (1) direct consumer testimony; (2) survey evidence; (3) exclusivity, manner, and length of use of a mark; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying by the defendant. Filipno Yellow Pages, 198 F.3d at 1151. Only when an applicant has established secondary meaning can a descriptive mark be registered on the Principal Register. 15 U.S.C. § 1052(f). Even where the PTO has not determined that a mark is distinctive for purposes of registration on the Principal Register, however, a mark can be registered on the Supplemental Register when the PTO determines that "the mark is capable of distinguishing." 15 U.S.C. § 1091; California Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451, 1454 (9th Cir. 1985). Moreover, proof of "substantially exclusive and continuous use" for the five years preceding the date on which a claim of distinctiveness is made is prima facie evidence of secondary meaning. 15 U.S.C. § 1052(f); California Cooler, 774 F.2d at 1454.

Here, there is evidence that DrugCheck has been sold continuously under that name for a period of eleven years, and has been a top-selling brand during that period.[10] Plaintiff proffers evidence of the value of the DrugCheck brand, in that, as early as 1998, a third-party was willing to expend $40,000 for the rights to market and distribute DrugCheck. (Hipple Decl ¶ 12.) The value of

---

[10] (Hipple Decl., Ex. 4; Declaration of Joanna Mendoza in Opposition to Amedica's Partial Motions for Summary Judgment, Ex. 36, hereafter, "Mendoza Decl.," Docket Item No. 242.)

9

the DrugCheck name is buttressed by Plaintiff's own investment in DrugCheck, first having taken an exclusive license to market DrugCheck from DFWA in 2004, and later having purchased outright the rights to DrugCheck in 2008.[11]

Finally, evidence of Defendants' own interest in DrugCheck furthers the conclusion that, at the very least, there are disputed issues of fact surrounding DrugCheck's secondary meaning. In this regard, Defendant Amedica offered to purchase the rights to DrugCheck in 2007. (Hipple Decl., Ex. 15.) Plaintiff has also submitted evidence tending to show that Defendants have borrowed on the goodwill of DrugCheck when advertising their DrugSmart product, and have directly sold allegedly pirated products bearing the "DrugCheck" name. (See, e.g., Johnson Decl., Exs. 13-14, 32-33; Mendoza Decl., Exs. 8-25.) Even Defendant Tydings has conceded the value associated with the DrugCheck brand, having stated that "without the name, [Plaintiff has] nothing." (Mendoza Decl., Ex. 35.)

Accordingly, the Court finds that there are disputed issues of material fact with respect to whether there is sufficient secondary meaning associated with "DrugCheck," such that it may qualify for federal trademark protection.

**2.   Plaintiff's Alleged Acquiescence**

Defendants contend that, even if DrugCheck is a valid trademark, Plaintiff has acquiesced to Defendants' use of the DrugCheck mark, and is thus barred from bringing its trademark claim. (Trademark Motion II at 3.)

Acquiescence is an equitable defense, which "is available when a plaintiff has responded to a defendant's actions with implicit or explicit assurances upon which the defendant relied." Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F. Supp. 2d 247, 276 (S.D.N.Y. 2002). This defense may be employed "only in those cases where the trademark owner, by affirmative word or deed" conveys its consent to another with respect to use of the trademark. Id.

---

[11] (Hipple Decl. 20, Ex. 6; Declaration of Paul Johnson in Opposition to Amedica's Partial Motions for Summary Judgment, Ex. 25, hereafter, "Johnson Decl.," Docket Item No. 241.)

10

In this case, Defendants rely on a statement in the Declaration of James Hipple, in which Hipple noted that his company DFWA, the former owner and licensor of DrugCheck, had "agreed to indemnify [Defendant] Amedica" for Amedica's domestic manufacture of DrugCheck cups for sale outside the United States. (Hipple Decl. ¶ 15.) Defendants, however, do not produce any documentary evidence in support of this purported indemnification, such that the Court has no means of identifying the nature or scope of its terms. Nor is it clear whether, having already given the exclusive domestic rights to DrugCheck to EDI, DFWA would have had any authority to give a later license to the same rights to Amedica. Assuming that EDI was the exclusive licensee, there is no basis for assuming that DFWA would, in its role as licensor, have the ability to acquiesce on EDI's behalf. Even if EDI's license was short of exclusive, there is still no evidence that EDI itself acquiesced to infringement of the limited rights that it possessed. In short, there is no proffered evidence that Plaintiff EDI engaged in any "affirmative word or deed," which can be construed as EDI having acquiesced to Defendants' allegedly improper use of the DrugCheck brand. See Empressa Cubana, 213 F. Supp. 2d at 276. Accordingly, there is insufficient evidence for a finding that Plaintiff has acquiesced to the use of the DrugCheck mark.

In sum, the Court finds that there are triable issues of fact on the issue of whether DrugCheck is a valid and enforceable trademark. Accordingly, the Court DENIES Defendants' motions for summary judgment on Plaintiff's trademark claims.

**B.    Business Torts**

Defendants Amedica and Chen move for summary judgment on Plaintiff's claims for intentional and negligent interference with contractual relations and prospective economic advantage[12] solely on the ground that Defendants Amedica, Chen, Zyon, Tydings and Kisera are not

---

[12] Plaintiff's Eleventh, Twelfth, Thirteenth and Fourteenth Causes of Action allege that Defendants negligently and intentionally "interfered with EDI's relationship with certain of its contractual relationships" and "acted to disrupt EDI's business and economic relationships with those in the market for drugs of abuse testing products." (Complaint ¶¶ 119, 125, 130, 136.) Plaintiff contends that Amedica and Zyon collaborated to interfere with Plaintiff's various contracts and business relationships, including Plaintiff's manufacturing agreement with Amedica, Amedica's licensing agreement with Zyon, Amedica's contract with a component manufacturer, and Plaintiff's

11

"strangers" to Plaintiff's contracts and business interests.[13]  (Tort Motion at 3.)  For the purposes of this motion, Amedica concedes "that [P]laintiff can prove the elements of wrongful interference with existing and prospective customer contracts . . . with the exception that [P]laintiff cannot prove Amedica or Zyon, nor their respective principals, were/are strangers to the referenced customer contracts."  (Tort Reply at 2.)

To prevail on a claim for intentional interference with contractual relations, a plaintiff must prove the following elements:  (1) the existence of a valid contract with a third party; (2) the defendant's knowledge of the contract; (3) an intentional act by the defendant designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) damage resulting to the plaintiff.  Quelimane Co. v. Stewart Title Guaranty Co., 19 Cal. 4th 26, 56 (1998).  The elements for negligent[14] interference with contractual relations are the same except that the plaintiff must show a merely negligent, instead of intentional, act by the

---

customer agreements and relationships. (Plaintiff's Opposition to Amedica's Partial Summary Judgment With Respect to Business Torts at 7-9, 17-18, hereafter, "Tort Opposition," Docket Item No. 248.)

[13] Although Defendants Amedica and Chen seek summary judgment on these causes of action with respect to themselves and Defendants Zyon, Tydings and Kisera, Amedica and Chen's counsel does not purport to represent Zyon, Tydings and Kisera. (See Tort Motion at 1.) Accordingly, the Court directs its analysis only to whether summary judgment is appropriate as to Amedica and Chen.

[14] The Court notes that there is a healthy debate as to whether California recognizes a cause of action for negligent interference with contractual relations. LiMandri v. Judkins, 52 Cal. App. 4th 326 (1997); Rachford v. Air Line Pilots Ass'n., 2006 WL 1699578 at *7 n.4 (N.D. Cal. 2006); see also Fifield Manor v. Finston, 54 Cal. 2d 632 (1960); J'Aire Corp. v. Gregory, 24 Cal. 3d 799 (1979).  In Fifield, the California Supreme Court noted: '[W]ith the exception of an action by the master for tortious injuries to his servant, thus depriving the master of his servant's services, which traces back to medieval English law ..., the courts have consistently refused to recognize a cause of action based on negligent, as opposed to intentional, conduct which interferes with the performance of a contract between third parties or renders its performance more expensive or burdensome . . . ." 54 Cal. 2d at 636.  Although the continuing validity of the so-called "Fifield" rule is questionable in light of the California Supreme Court's recognition in J'Aire of a cause of action for negligent interference with prospective economic advantage, the Supreme Court has yet to disapprove Fifield. See LiMandri, 52 Cal. App. 4th at 349.
    Here, since the parties have not raised this issue, the Court declines to comment on the validity of both of Plaintiff's negligent interference causes of action.  At some appropriate time, if necessary, the Court may invite further briefing on this issue.

1  defendant designed to induce a breach or disruption of the plaintiff's contractual relationship. See
2  SCEcorp. v. Superior Court, 3 Cal. App. 4th 673, 677 (1992).

3  Similarly, to prevail on a claim for intentional interference with prospective economic
4  advantage, a plaintiff must prove the following: (1) an economic relationship with a third party
5  creating a reasonable expectation of future economic benefit; (2) the defendant's knowledge of the
6  relationship; (3) an intentional act by the defendant designed to disrupt the relationship; (4) actual
7  disruption of the relationship; and (5) damage resulting to the plaintiff. Korea Supply Co. v.
8  Lockheed Martin Corp., 29 Cal. 4th 1134, 1153-54 (2006). Like in the contract setting, a plaintiff
9  must prove a merely negligent, instead of intentional, act by the defendant to establish negligent
10 interference with prospective economic advantage. North American Chem. Co. v. Superior Court, 59
11 Cal. App. 4th 764, 786 (1997).

12 In California, only a "stranger" can be liable for interference with contract and economic
13 expectations torts. Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 513 (1994).
14 "California law has long recognized that the core of intentional interference business torts is
15 interference with an economic relationship by a third-party stranger to that relationship." ViChip
16 Corp. v. Lee, 438 F. Supp. 2d 1087, 1097 (N.D. Cal. 2006) (citing Della Penna v. Toyota Motor Sales
17 U.S.A., Inc., 11 Cal. 4th 376 (1995)). Thus, "[c]onsistent with [the] underlying policy of protecting
18 the expectations of contracting parties against frustration *by outsiders* who have no legitimate social
19 or economic interest in the contractual relationship, the tort cause of action for interference with a
20 contract does not lie against a party to the contract." Applied Equpment Corp., 7 Cal. 4th at 513.
21 (emphasis in original).

22 However, there are circumstances where a defendant may be liable for interference with a
23 contractual relationship or prospective economic advantages even where that defendant has a "clear
24 involvement and mutual economic interest" in a business relationship. See Woods v. Fox
25 Broadcasting, 129 Cal. App. 4th 344, 355 n.10 (2005) (citing Applied Equipment, 7 Cal 4th at 521

(where a supplier could not be liable for interfering with its own contract with a buyer, the supplier could still be liable for interfering with a related subcontract between the buyer and a third-party)).

In this case, the parties do not dispute the existence of Plaintiff's various contracts and business relationships. (Tort Motion at 3.) Plaintiff was a third-party beneficiary to a license agreement between Zyon and Amedica, whereby Amedica was granted a non-exclusive license to use Zyon's patent in connection with the manufacture and sale of DrugCheck cups to Plaintiff.[15] Plaintiff and Amedica entered into an agreement under which Amedica manufactured DrugCheck cups for Plaintiff to sell to Plaintiff's customers. (Chen Decl. Re Business Torts ¶¶ 4, 5, Ex. B.) To manufacture DrugCheck for Plaintiff, Amedica had to engage in a business relationship with D&D Plastics, who manufactured an important component part of the DrugCheck cups.[16] Further, Plaintiff contracted with, and reasonably expected to enter future contracts with, customers who would purchase and resell DrugCheck cups.[17] Thus, although Amedica cannot be liable for interfering with its own contracts with Plaintiff, Zyon or D&D, the component manufacturer, because it is a party to those contracts, Amedica is not a party to the contracts and business relationships between Plaintiff and Plaintiff's customers. See Applied Equipment, 7 Cal. 4th at 513.

Despite this lack of contractual privity, Amedica contends that it is not a stranger to those relationships because, as the upstream manufacturer of the product sold by EDI, it has a "direct economic interest" in those relationships. (Tort Motion at 7.) Contrary to Amedica and Chen's statement of the law, under Woods, a mere involvement or economic interest in a contract or prospective economic relationship does not, as a matter of law, make Amedica immune from liability for interfering with those relationships as a non-stranger. Since Amedica and Chen's motion rests

---

[15] (Declaration of Chen in Support of Motion for Partial Summary Judgment Re Business Torts ¶¶ 3, 5, Ex. A, hereafter, "Chen Decl. Re Business Torts," Docket Item No. 214.)

[16] (Declaration of Rick Olson in Opposition to Amedica's Partial Motions for Summary Judgment ¶¶ 8-9, Docket Item No. 243.)

[17] (Johnson Declaration ¶ 4; Defendant Amedica's Reply to Opposition of Plaintiff to Amedica's Motion for Summary Judgment to Dismiss Business Torts Counts at 2, 5, hereafter, "Business Torts Reply," Docket Item No. 266.)

entirely on the premise that their economic relationship precludes liability, they have failed to establish that there is no genuine issue of material fact with respect to Plaintiff's claims for interference with its customer contracts and prospective economic interests.

Accordingly, the Court DENIES Defendants' motion for partial summary judgment on Plaintiff's business torts claims, to the extent those claims are based on business relationships in which Defendants are not directly parties. The Court GRANTS Defendants' motion for partial summary judgment on Plaintiff's business torts claims, to the extent those claims are based on Defendants' interference with contracts to which they are directly parties.

### C.     **Defendants' Contempt Motion**

Defendants move to hold Plaintiff in contempt with respect to Plaintiff's alleged failure to adhere to its discovery obligations. (Contempt Motion at 1.) Defendants also objects to Magistrate Judge Trumbull's June 2, 2008 Discovery Order (Docket Item No. 210). (Id. at 5.)

The Court finds no basis for holding Plaintiff in contempt with respect to its discovery obligations. In addition, Defendant's objections to Judge Trumbull's Order were filed on July 3, 2008, and thus were not within the ten day period allowed by Fed. R. Civ. P. 72. Accordingly, the Court DENIES Defendants' Motion re: Plaintiff's Contempt and Objections to Magistrate's Discovery Order.

### V.  CONCLUSION

The Court orders as follows:

(1)     The Court DENIES Defendants' Motions for Partial Summary Judgment on Plaintiff's Trademark Claims.

(2)     The Court DENIES Defendants' Motion for Summary Judgment on Plaintiff's Business Tort Claims to the extent those claims are based on interference with relationships to which Defendants are not directly parties. The Court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's Business Tort Claims to the

        extent those claims are based on interference with contractual relationships to which Defendants are directly parties.

    (3)    The Court DENIES Defendants' Motion for Contempt and Objections to Magistrate's Discovery Order.

The parties shall appear for a Preliminary Pretrial Conference on **February 9, 2009 at 11 a.m.** On or before **January 30, 2009**, the parties shall file a Joint Preliminary Pretrial Statement. The Statement shall include, among other things, the parties' proposed trial schedule and an update regarding the parties' settlement efforts.

Dated: January 15, 2009

JAMES WARE  
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Joanna R. Mendoza jmendoza@theiplawfirm.com
Joseph Lawrence Strabala legal@quantumsi.com
Martin H. Orlick mho@jmbm.com
Richard Allen Nebb rnebb@vierramagen.com
William N. Woodson wnw@woodsonallen.com

Dated: **January 15, 2009**                              **Richard W. Wieking, Clerk**

                                                         **By:   /s/ JW Chambers                      **
                                                              **Elizabeth Garcia**
                                                              **Courtroom Deputy**